Charles F. Allen v. Commissioner. Charles F. Allen and Daisy S. Allen v. Commissioner.
Allen v. Commissioner
Docket Nos. 85837 & 85838.
United States Tax Court
T.C. Memo 1961-348; 1961 Tax Ct. Memo LEXIS 1; 20 T.C.M. (CCH) 1840; T.C.M. (RIA) 61348; December 29, 1961
*1 Petitioner Charles F. Allen was a waiter in 1955 and 1956. He kept his tips in a coffee can, counting the deposits therein monthly. He reported total tips of $978.40 for 1955 and $1,005 for 1956. Respondent alleged that petitioner's records were inadequate and that tips were understated for each year. Respondent made a redetermination of tips. Held, respondent's determination was inaccurate and arbitrary. Held further, petitioner Charles F. Allen's records were inadequate and inaccurate. Held further, petitioner Charles F. Allen received tips of $1,795.95 in 1955 and $1,666.47 in 1956. Charles F. Allen, pro se, Box 763, Big Bear Lake, Calif. Allan I. Blau, Esq., and Edward M. Fox, Esq., for the respondent. BRUCE *2 Memorandum Findings of Fact and Opinion BRUCE, Judge: Respondent determined deficiencies in petitioners' income taxes as follows: Docket
No.
Year
Deficiency
85837
1955
$316.46
85838
1956
186.93
The following issues are before us for determination: (1) Whether petitioner understated tips received in the years 1955 and 1956, and (2) if so, whether respondent's redetermination of the amount of tips is correct. Findings of Fact Petitioners, Charles F. Allen and Daisy S. Allen, were husband and wife during the calendar years 1955 and 1956. They presently reside at Big Bear Lake, California. Petitioner Charles F. Allen filed a separate income tax return for the calendar year 1955 and petitioners filed a joint income tax return for the calendar year 1956. Both returns were filed with the district director of internal revenue at Los Angeles, California. Petitioner Charles F. Allen, hereinafter referred to as petitioner, commenced his occupation as a waiter in 1940. He continued to be so occupied through and including the years involved herein, with the exception of four years' service in the Armed Forces during the years 1942 to 1946. Petitioner's employment *3 as a waiter from 1940 through 1956, except for a brief period in 1946 or 1947, was with the Biltmore Hotel, in Los Angeles, California. During the years in question, he was a member of a local waiters' union. During the years involved herein the Biltmore was considered to be a fine hotel with a good reputation. From January 1955 through the middle of October 1956 petitioner worked in the Bowl department of the Biltmore, and for the balance of 1956 he was assigned to the Rendezvous Room of the hotel. The Biltmore Bowl was a dining room with dinner-dance facilities and a capacity of approximately 900 people. It was open to the public every evening except Sunday, and when so opened was operated as a night (supper) club with a chorus line, fouract show, and ten-piece orchestra. In addition to its night (supper) club operation (hereinafter sometimes referred to as the regular or a la carte operation), the Bowl frequently was used for private breakfast, lunch, or dinner banquets. In its operation as a night club, during the years involved herein, the Bowl offered a selection of beverages and full course dinners ranging in price from $2.50 to $6. In addition to the revenue from *4 the sale of food and beverages, whenever it was open to the public the Bowl received revenue from cover charges amounting to $1 per person on week nights and $1.50 per person on Saturday evenings. The Rendezvous Room was a dining-dancing room operation open to the public from mid-morning through the evening. In addition to its public or a la carte operation the Rendezvous Room offered private banquet facilities. For the year 1956 the Rendezvous Room had revenue from the sales of food and beverages, and for the months of January through September of that year there was additional revenue from the receipt of cover charges. During the dinner hours patrons were provided with a four or five-piece band and dancing privileges. The Bowl had a reputation as an excellent supper club. Both the Bowl and the Rendezvous Room were considered to be first-class dining and dancing rooms, ranking with the better eating and entertainment places in Los Angeles. During the years involved herein the Bowl usually was staffed with 10 waiters (hereinafter sometimes referred to as the regular waiters), including petitioner, to handle the a la carte operation. The regular waiters also served as banquet *5 waiters. For banquet operations, or in the event of large supper club crowds, usually present on Friday and Saturday evenings, extra waiters obtained through the local waiters' union and from various departments within the Biltmore, assisted. In addition to his employment as a regular waiter, petitioner served 41 and 86 banquets in the Bowl in 1955 and 1956, respectively. During 1955 and 1956, petitioner had a front station in the Bowl. This station had an above-average turnover in patrons and was considered to be at least an average station. During the last two and one-half months of 1956, he worked only the public, or a la carte evening shift of the Rendezvous Room and was assigned to an average station. He did not work any banquets in the Rendezvous Room during that period. Petitioner was a fast and courteous waiter who possessed and exhibited a congenial personality. His abilities were well regarded by his superiors, and he did not have any physical infirmities which impaired these abilities. He customarily worked a five-day week, but did take occasional extra days off. Gross receipts of the Bowl, exclusive of sales and cabaret taxes, for the years 1955 and 1956 were *6 as follows: Beverage (including
Year
Food
French Bar)
Cover Charges
Total
1955
$699,928.30
$197,682.54
$114,626.19
$982,237.03
1956
573,148.27
151,917.42
85,228.40
810,294.09
Gross receipts of the Rendezvous Room, exclusive of sales and cabaret taxes, for the year 1956 were as follows: Cover
Food
Beverage
Charges
Total
$110,093.02
$184,604.51
$4,165
$298,862.53
Total gross cash wages (exclusive of meals and before payroll deductions) paid to all Bowl waiters for the years 1955 and 1956, and paid to all Rendezvous Room waiters for the year 1956, were as follows: Rendezvous
Year
Bowl
Room
1955
$66,656.15
1956
56,973.73
$28,360.03
During the years in question, with respect to banquets, it was the recognized policy and practice of the Biltmore to request and receive from its banquet patrons a surcharge of at least 10 percent of the total food and beverage charges as a gratuity for waiters and other food-service personnel. The hotel collected the banquet tips, retained 15 percent of the amount collected for distribution to supervisory personnel, and forwarded the balance *7 of 85 percent to the local union for distribution to the waiters through the shop steward. Banquet gratuities received by petitioner during the various months of the years 1955 and 1956 were as follows: 1955
1956
Month
Amount
Amount
January
$ 27.38
$ 81.92
February
45.05
31.69
March
29.04
10.97
April
18.86
43.06
May
12.54
44.66
June
9.66
25.93
July
5.13
1.82
August
1.60
September
10.92
33.05
October
4.10
17.13
November
16.73
17.58
December
30.59
14.99
Total
$210.00
$324.40
The total number of banquets served in the Bowl, the total tips received on such banquets, and the total number of waiter-banquets worked by the regular Bowl waiters only (excludes extras) for the years 1955 and 1956 were as follows: Total Number of
Total
Waiter-Banquets
Banquets
Worked by Reg-
Served in
Total Tips
ular Waiters
Year
Bowl
Received
Only
1955
200
$40,510.09
1,399
1956
190
38,202.02
1,426
The average salary received by a waiter for working a banquet in the Bowl during the years 1955 and 1956 was an estimated $6 per banquet. Petitioner, for the years 1955 and 1956, was paid *8 gross cash wages with respect to supper club or a la carte service and gross cash wages with respect to banquet service (both exclusive of meals and before payroll deductions) in the amounts which follow: A La Carte
Banquet
Year
Wages
Wages
1955 - Bowl
$1,539.76
$302.60
1956 - Bowl
1,162.49
560.30
1956 - Rendezvous Room
380.12
Petitioner, for the years 1955 and 1956, reported the above amounts as wages on his income tax returns and, in addition, reported income from tips on such returns in the amounts of $978.40 and $1,005, respectively. During the years in question, all banquet and a la carte revenues of the Bowl and Rendezvous Room were subject to state and local sales taxes of 4 percent, and during this same period all of the a la carte revenues of the Bowl and substantially all of the a la carte revenues of the Rendezvous Room were subject to a 20 percent Federal cabaret tax. The amounts received by the Biltmore from banquet sales in the Bowl, exclusive of taxes, for the years 1955 and 1956, were approximately $405,101 and $382,020, respectively. The revenue received by the Biltmore from banquet sales in the Rendezvous Room, exclusive *9 of taxes, for the year 1956 was approximately $24,966, computed as follows: Banquet revenues actually reflected in
Rendezvous Room daily book
$12,016
Tips received on those banquets
where actual amount of sale
was not set forth in the daily
book
$1,295
multiplied by factor of
10
12,950
Total banquet revenue
$24,966
The wages paid to all regular Bowl waiters for banquet work during the years 1955 and 1956 were approximately $8,394 and $8,556, respectively. Regular (a la carte) charge sales tabs of the Bowl and Rendezvous Room for the months of February 1955 and September 1956 show gratuities on charged items in those months in excess of 19 percent of the total food, beverage, and cover charges plus sales and cabaret taxes with respect to the Bowl and in excess of 18 percent of such charges and taxes with respect to the Rendezvous Room. During the years in question, petitioner did not keep a daily record of tips received or the days that he was employed. He placed his tips in a coffee can. At the end of each month he emptied the can and counted the money therein. His records show an entry for each of the months of 1955 and 1956. Petitioner did *10 not show any records of his tip income for 1955 and 1956 to the Internal Revenue agents. Petitioner, for the selected months hereinafter set forth, worked the following number of hours in the Bowl as a regular waiter and banquet waiter: Hours
Worked
Year 1955
Regular
Banquet
January
112
43
February
96
60
March
152
28
April
128
28
July
172
1
Year 1956
March
144
13
April
112
44
July
160
3
Petitioner, during the bi-monthly payroll periods ended July 31, August 15, September 30, and October 15, 1955, did not work more than five days a week as a regular (a la carte) waiter in any one period. The total days worked in each period were 11, 10, 6, and 7 days respectively. Petitioner took two separate one-week vacations during the bi-monthly payroll periods ended September 30 and October 15, 1955. He received his vacation pay with respect thereto in his paychecks for the periods ended September 30 and October 31. About 15 percent of petitioner's a la carte tips went to bus boys or others. Of the total a la carte gratuities he received, petitioner actually retained about 85 percent. Petitioner's tips on a la carte service averaged 15 *11 percent in each of the years 1955 and 1956. His a la carte tips totalled $1,585.95 in 1955 and $1,342.07 in 1956. Understatements of tips amounted to $817.55 for 1955 and $661.47 for 1956. Opinion Petitioner, Charles F. Allen, was employed as a waiter in the Biltmore Hotel in Los Angeles, California, during the years 1955 and 1956. During all of 1955 and until the middle of October 1956 he waited on tables in the Biltmore Bowl. The Bowl served food and liquor; provided dancing facilities; and during the evenings had a ten-piece band and a floor show. From mid-October 1956 and until the end of that year, petitioner worked as a waiter in the Rendezvous Room, a dining and dancing room in the Biltmore. Petitioner waited on both private banquets and so-called a la carte or regular patrons in the Bowl. His service in the Rendezvous Room was limited to a la carte patronage. There are in issue in this case the amounts of tips earned by petitioner during the years 1955 and 1956 from the above-mentioned employment. Taxability of the tips is not questioned. See, e.g., Harry A. Roberts, 10 T.C. 581 (1948), affd. 176 F. 2d 221 (C.A. 9, 1949). Petitioner placed *12 in evidence a record of tips he claims to have kept on a monthly basis. The figures thereon tally with tips reported on his 1955 and 1956 income tax returns. Petitioner asserts that he took his tips home daily and placed them in a coffee can. He claims that at the end of each month he counted the money in the can and made a notation of the amount. He says that the records he produced constitute these monthly recordings made by him. Respondent asserts that the record is neither accurate nor adequate and that, in fact, petitioner had income from tips substantially in excess of the amounts reported. Respondent claims that because of the inadequacy and inaccuracy of petitioner's records, income properly has been reconstructed on the basis of other available information in accordance with section 446(b), Internal Revenue Code of 1954. It is clear that respondent's determination is entitled to a presumption of correctness until and unless it is proved inaccurate or arbitrary. We have examined the record in this case and conclude that respondent's determination is not in accordance with the known facts and is inaccurate and arbitrary. The same method was used by *13 respondent with respect to both years. We will demonstrate the method by reference to the figures used for 1955 with respect to tips earned in the Bowl. From hotel records respondent learned that total Bowl receipts in 1955 were $982,237, including $114,626.19 in cover charges but not including local sales taxes or cabaret taxes. On the basis of testimony of supervisory personnel of the Biltmore, it was determined that tips on banquets amounted to approximately 10 percent of banquet sales. Since the total amount of banquet tips, $40,510.09, was known, the total banquet sales were computed by multiplying the tips by 10, resulting in a total revenue from banquet sales of $405,100.90. This figure was then deducted from total sales in the Bowl to arrive at a total figure for a la carte revenue of $577,136. Respondent's next step was to arrive at what he deemed the proper percentage of tips left by patrons on a la carte sales. On the basis of tips shown on sales charged by patrons, respondent determined that tips on a la carte sales amounted to 19 percent of the total billings, exclusive of sales and cabaret taxes, or an estimated total for a la carte tips for all waiters of $109,656. Respondent *14 then proceeded to arrive at a figure representing the amount of tips received by waiters per dollar of salary earned by waiters. The total figure for salaries was taken from Biltmore records. From total wages paid - $66,656 - respondent deducted an estimated figure of banquet wages paid. The banquet wages were computed by multiplying the number of waiter-banquets served during the year by regular waiters, 1,399, by $6, representing an estimate by respondent of the average amount paid a waiter for serving at a banquet. This computation resulted in a total of $8,394 in estimated banquet wages and there thus remained a total of $58,262 for estimated a la carte wages. Respondent then divided the estimated a la carte wages into the estimated total of a la carte tips to arrive at the factor hereinbefore referred to. This factor, $1.88, was then multiplied by the total a la carte wages earned by petitioner, as disclosed by the hotel records, $1,539.76. It is respondent's contention that the resulting figure constitutes total a la carte tips earned by petitioner in 1955. To this total he adds the known tips earned by petitioner from banquets in 1955, $210, to arrive at total tips for the year. *15 It is clear at the outset that, while the use of wages is merely a means of allocating the tips among the several waiters employed, the computation employed by respondent necessarily implies a relationship between wages earned by a waiter and tips earned by a waiter. Tips are based not on a waiter's wages but on a patron's bill. Therefore, the method used by respondent demands careful scrutiny. We have taken the known factors with respect to banquet wages, tips, and receipts and employed respondent's a la carte computation to see if, when applied to a known situation, it is accurate. It is not. We know that petitioner was paid $302.60 in wages for waiting on banquets in 1955. We know, in addition, from records maintained by the union, that petitioner's tips from banquets in 1955 totalled $210. We may note first that the ratio of petitioner's banquet tips to his banquet wages discloses that he earned less than 70 cents in tips for every dollar of banquet wages. Moreover, we know that total banquet tips in 1955 were $40,510.09. This figure must be adjusted to take into account the fact that waiters received only 85 percent of these tips, as is disclosed by testimony in the record. *16 Thus, the total of banquet tips going to waiters in 1955 is $34,433.58. If we divide this figure by the total for banquet wages computed by respondent in arriving at a la carte wages, $8,394, to arrive at the factor to be used in computing an individual waiter's tips, we note that the resulting factor is in excess of $4. Such a factor multiplied by petitioner's total banquet wages would result in an assertion that he earned in excess of $1,200 in banquet tips in 1955. We know, however, that he earned only $210 in banquet tips in 1955. We may make a further computation, however, since the record demonstrates that additional waiters were employed by the hotel for banquets. An adjustment for this fact is necessary since the banquet wages initially computed in arriving at a la carte wages were based on the total of "regular" waiter-banquets. The record indicates that the number of extra waiters taken on to serve banquets did not more than double the regular waiter force. Assuming, therefore, that instead of 1,399 waiter-banquets there were 2,800 waiter-banquets, and thus, in round figures, $16,800 in wages paid to waiters for serving at banquets, we may divide the known tips distributed *17 among waiters for serving at banquets, $34,433.58, by this figure for banquet wages, in which case we arrive at a factor of about $2.05. In other words, using respondent's method of computing the total amount in tips earned for every dollar of wages earned, and employing figures most favorable to the purported accuracy or reasonableness of respondent's computations, we note that the total tips arrived at by use of such a method, multiplying petitioner's banquet wages of $302.60 by the factor we have just computed, $2.05, is in excess of $600, or about three times the $210 in tips we know petitioner earned from waiting on banquets in 1955. Analysis of the 1956 banquet figures produces a similar disparity between known amounts and amounts produced by using respondent's method of reconstruction. From the above discussion it is readily apparent that respondent's theory is not in accordance with the known facts. Furthermore, it will be noted that however reasonable the method employed by respondent, it is based on numerous estimates of a la carte receipts, tip percentages, and a la carte wages. It is clear, moreover, that even if we adjust downward respondent's 19 percent figure for *18 tips, the computations employed by respondent do not check out when applied to the known figures for banquet wages and tips. From all of the above, we conclude that, whether or not petitioner's records were accurate or adequate, respondent's reconstruction or recomputation of tips earned by petitioner from a la carte service is both unreasonable and arbitrary. Thus, the presumption of correctness originally attaching thereto evaporates. Helvering v. Taylor, 293 U.S. 507 (1935); Cohen v. Commissioner, 266 F. 2d 5 (C.A. 9, 1959), remanding a Memorandum Opinion of this Court; Clark v. Commissioner, 266 F. 2d 698 (C.A. 9, 1959), modifying a Memorandum Opinion of this Court. Although we do not uphold respondent's computation, we must, nevertheless, examine carefully the whole record to determine whether a deficiency does exist in this case. We are satisfied that while there is no indication that petitioner attempted to conceal any tips earned by him and testified with respect to his income in a forthright manner, his records were not kept on a daily basis and his method of accumulating tips for a month at a time in a coffee can may have resulted *19 in certain inaccuracies. We are mindful of the fact that even daily accounting systems are subject to error and we deem it probable, in the light of other facts disclosed by the record, that petitioner's monthly accounting method contains error. For example, the record kept by petitioner is inaccurate with respect to vacation dates. Moreover, we have no convincing assurance petitioner or other members of his family may not have "dipped into the till" (coffee can) during the month, whenever necessity arose, without accounting for the same. The method of accounting for his tips followed by petitioner lends itself to such probability and such incursion would comport with human behavior. Consequently we are unable to find that petitioner's records were adequate, or that his computation of his tips was accurate. Accordingly, we have examined the record to determine the amount of tips earned by petitioner from a la carte service in the years 1955 and 1956. Cohen v. Commissioner, supra. The Biltmore Hotel has a good reputation in Los Angeles. Both the Bowl and the Rendezvous Room, in the years before us, were fine eating establishments. Meals in the Bowl ranged in price from *20 $2.50 to $6. The atmosphere of both rooms was conducive to liberal spending. The record discloses that petitioner had at least average stations and was an agreeable and capable waiter. Furthermore, he began working as a waiter in 1940 and had more than 10 years' experience by 1955. From the whole record, therefore, and on the basis of the approximately 20 percent tip usual to charge items in the Bowl, we are satisfied that petitioner received not less than an average 15 percent tip on a la carte service. Accordingly, the following computations of a la carte tips are made: In 1955 petitioner had banquet wages of $302.60. He received $210 in tips. This represents about $0.69 in tips per dollar of wages earned. This figure necessarily reflects the fact that individual waiters received only 85 percent of total tips paid in, the other 15 percent going to supervisory personnel. Similarly, with respect to a la carte tips, supervisory personnel and bus boys received part of petitioner's tips. Thus, since the factor computed with respect to banquet tips reflects this 15 percent which does not reach the waiter, use of a factor based thereon to compute a la carte tips automatically takes into *21 account a similar percentage of tips going to persons other than petitioner. Banquet tips averaged about 10 percent of sales. We have found, however, that a la carte tips averaged 15 percent on a la carte service. Accordingly, the factor found with respect to banquet wages in 1955, approximately $0.69 in tips for every dollar of banquet wages earned, is increased by half in order to arrive at the factor to be applied to a la carte wages to compute a la carte tips. We find, therefore, that petitioner earned $1.03 in tips for every dollar of a la carte wages earned in 1955, or a total of $1,585.95. Applying the same method to 1956, we arrive at the following figures: Total banquet wages earned in 1956 were $560.30. Total banquet tips in 1956 were $324.40. This produces a factor of approximately $0.58 in tips for every dollar of banquet wages earned. Thus, the factor for a la carte tips is about $0.87. We find, therefore, that petitioner earned a total of $1,342.07 in a la carte tips in 1956. Total tips were $1,795.95 and $1,666.47 in 1955 and 1956, respectively. Petitioner reported only $978.40 in tips in 1955 and $1,005 in tips in 1956. We find, therefore, that he understated his *22 income in the amounts of $817.55 and $661.47 for the years 1955 and 1956, respectively. Decisions will be entered under Rule 50.