Parker A. Eckles and Theresa Eckles v. Commissioner.
Eckles v. Commissioner
Docket Nos. 68835, 76951, 91025.
United States Tax Court
T.C. Memo 1962-303; 1962 Tax Ct. Memo LEXIS 5; 21 T.C.M. (CCH) 1614; T.C.M. (RIA) 62303; December 28, 1962
*5 Cameron B. Aikens, Esq., 6435 Wilshire Blvd., Los Angeles, Calif., for petitioner Parker A. Eckles. Wellman P. Thayer, Esq., for petitioner Theresaeckles. Allan I. Blau, Esq., Roger Rhodes, Esq., and Wesley A. Dierberger, Esq., for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: Deficiencies in the income tax of petitioners and additions to tax have been determined by respondent for the following years in the respective amounts indicated below: Addition to Tax,
I.R.C. 1939
Dkt.
Income Tax
No.
Year
Deficiency
Sec. 294(d)
68835
1952
$24,367.74
$4,706.22
1953
29,605.00
4,943.78
1954
10,652.22
683.59
76951
1955
13,021.03
0
1956
26,369.56
0
91025
1957
8,160.05
0
1958
7,614.40
0 By amendment to his answer filed prior to the hearing, respondent claims in the alternative a single deficiency in the amount of $155,685.72 for the taxable year 1958. By amendment to his answer filed subsequent to the hearing hereof on motion granted by the Court with respect to Docket No. 91025, respondent claims additions to the deficiencies for 1957 and 1958 in the respective amounts of *6 $2,486.87 and $2,888.06. At the hearing respondent conceded error with respect to additions to tax under section 294(d)(2), Internal Revenue Code of 1939, for the years 1952 and 1953 and petitioners conceded the additions to tax under section 294(d)(1) for such years and under section 294(d)(2) for 1954 dependent only upon their proper tax liabilities for the respective years of concession as herein found. On brief and at the hearing petitioners conceded the receipt of $4,800 of unreported rental income for each of the years 1957 and 1958. Another issue with respect to the taxable year 1958 raised by petitioners in their petition has, in their brief, been specifically abandoned. All such concessions will be given effect under Rule 50. These dockets have been consolidated. The remaining issues to be decided are: 1. Are periodic withdrawals made by petitioner Parker Eckles from P. A. Eckles, Inc., distributions of corporate profits taxable as dividend income in the years 1952 through 1958? 2. In the alternative, if the withdrawals do not constitute dividends in each of the years 1952 through 1957, then is the entire cumulative total of the withdrawals, which were made in the *7 years 1952 through 1958, a distribution of profits taxable as dividend income in the year 1958? 3. Are certain amounts received by petitioners from P. A. Eckles, Inc., in the years 1953 and 1955 distributions of profits taxable as dividend income rather than reimbursements for expenses? 4. Are petitioners entitled to deduct as business expenses in the years 1952 through 1956 certain amounts allegedly spent by Parker on behalf of P. A. Eckles, Inc., for which he was not reimbursed? Findings of Fact The stipulated facts are hereby found. Wherever the name Parker appears it will refer to petitioner Parker A. Eckles, and wherever the name Theresa appears it will refer to petitioner Theresa Eckles. Petitioners have been husband and wife since September 1939 but after June 1950 and through the year 1960 petitioners were living separate and apart in Los Angeles County, California. During the year 1961, Theresa instituted an action for divorce from Parker in the County of Los Angeles which action is still pending. During each of the years 1952 through 1960 petitioners by mutual consent filed joint Federal income tax returns with the district director of internal revenue, Los *8 Angeles, California. P. A. Eckles is a California corporation which was incorporated on April 1, 1948, and is still in existence. For the years 1951 through 1960 the corporation also filed its Federal income tax returns with the district director of internal revenue, Los Angeles, California. From 1938 until July 1, 1947, Parker operated a franchised Oldsmobile dealership in Los Angeles as a sole proprietorship. On July 1, 1947, the assets of this dealership were transferred to a limited partnership which continued the Los Angeles dealership business until March 31, 1948, at which time the dealership was transferred to the corporation. The limited partnership was composed of Parker as the general partner holding a 51 percent interest therein as his separate property and Theresa as the limited partner holding a 49 percent interest therein as her separate property. Upon the formation of the corporation all of the assets of the limited partnership, other than cash in the amount of $12,840.45 and land located at 4270 S. Vermont, Los Angeles, were transferred to the corporation in exchange for 500 shares of capital stock having a total par value of $50,000 and the corporation's promissory *9 note in the amount of $28,000. Of the stock so issued by the corporation, 255 shares were issued to Parker and 245 shares were issued to Theresa. The shares so issued constituted their respective separate property under the laws of the State of California. The aforementioned land and cash not transferred to the corporation were retained by the petitioners, the land being held in joint tenancy. In August 1948, in order to increase the capital of the corporation to conform to General Motors Corporation's requirements, the mentioned promissory note of the corporation was surrendered by Parker and Theresa to the corporation in exchange for 250 shares of the corporation's capital stock and a new promissory note in the amount of $3,000. The 250 shares of stock issued in exchange for the note were issued in the name of Parker, individually, but the shares of stock were, and still are, in fact owned by Parker and Theresa as their respective separate properties under the laws of the State of California in the ratios of 51 percent and 49 percent, respectively. The 750 shares of capital stock of the corporation issued as described above have at all times since August 1948 to the present constituted *10 all of the issued and outstanding shares of the corporation. From January 1, 1952, through September 1959, the corporation's president was Parker and its board of directors was composed of Parker, Theresa, and Clifford Wilson, the husband of Theresa's daughter by a previous marriage. Theresa and Wilson were also named as officers of the corporation and, during most of the years at issue herein, Wilson acted as the corporation's sales manager. However, during this entire period, with the consent and knowledge of Theresa and Wilson, Parker alone exercised full and complete control of all operations and activities of the corporation. During the years 1952 through 1959 the corporation maintained its checking account in the Bank of America. During the years 1952 through 1959 Parker maintained his personal bank account with the Security First National Bank. From the date of its incorporation through August 1955, the corporation operated as an Oldsmobile dealer under a franchise from General Motors Corporation and pursued active business operations at all of the following locations in Los Angeles: (a) Premises at 4074 to 4084 S. Vermont Avenue and 929-931 W. 41st Street, Los Angeles, *11 which premises were leased from strangers to the corporation on a year to year basis at a monthly rental of $400. (b) Premises at 4270 S. Vermont Avenue which were leased from Parker and Theresa on May 1, 1948, for a term of 10 years at an original monthly rental of $200. Pursuant to the terms of this lease, the corporation in 1949 erected a dealership building on the 4270 S. Vermont Avenue property at a cost of approximately $133,000. In December 1953, the rental of this property was increased to $400 a month. (c) Fee owned land at 4300 S. Vermont which the corporation purchased prior to December 1949 at a cost of approximately $16,000. In August 1955, the corporation terminated its operation as a franchised Oldsmobile dealer and shortly thereafter engaged in the business of selling used cars at 333 S. Vermont, Los Angeles, until October 1956. The corporation made a few sales of automobiles in 1957 and continued to maintain a small inventory of used automobiles through December 31, 1960. In addition to the used car business described above, the corporation engaged in the following business activities from September 1, 1955, through December 30, 1960: (a) On September 1, 1955, the *12 corporation entered into a new lease with petitioners covering the premises at 4270 S. Vermont Avenue for a period of 10 years ending on August 31, 1965, at a continued rental of $400 per month. The corporation paid rent to Parker under this lease from September 1955 through May 1960. (b) Subsequent to August 1955, the corporation's leases on the properties at 4074-4084 South Vermont Avenue and 929-931 West 41st Street were continued by it on a year to year basis at a total rent of $400 per month at least until November 1960. (c) From September 1955 through December 1959, the corporation continuously leased its fee owned property and continuously (except for the month of March 1959) subleased all of its leasehold properties to various individuals. These aforementioned leases and subleases provided for tenancies ranging from 1 month to 3 years and the rentals received by the corporation during the September 1955-December 1959 period approximated $2,500 per month. (d) During a part of 1960 the corporation rented a portion of its leasehold properties. (e) In 1956 the corporation engaged with Roland Reed Associates in the production of a pilot television film with a view toward *13 marketing a television series based upon the format of the pilot film. The corporation invested $10,000 in this venture in 1956, and in 1957 it invested an additional $10,250 therein. Since 1956 there has been a continuous attempt to obtain a sponsor for the anticipated television series. (f) In 1957 the corporation, as a 50 percent partner with two other individuals, purchased 80 acres of raw land near Lancaster, California, at a total cost of $126,000 for the purpose of subdividing the property. From the time of purchase to the present, the corporation has made various attempts to sell the land. After its organization and until March 1960, Parker received a base gross salary of $1,000 per month from the corporation. In addition, during these years pursuant to a bonus plan adopted by the corporation Parker was entitled to receive a bonus each year based upon the net profits of the corporation for the preceding year. With respect to the years in question, in accordance with this plan, Parker received bonuses in each of the years 1952 through 1956. During the years 1952 through 1959, the corporation claimed and deducted various amounts as travel and entertainment expenses which *14 expenses included amounts paid directly to Parker as a reimbursement for expenses allegedly incurred by him on behalf of the corporation. In addition to the salaries and bonuses, alleged expense reimbursements and rentals received by Parker from the corporation during the years 1952 through 1959, certain other disbursements were made by the corporation either directly to or for the benefit. Substantially all of these disbursements were made directly to Parker in the form of corporation checks drawn to his order which checks were either cashed by Parker or deposited in his bank account at Security First National Bank. The "other disbursements" made by the corporation for the benefit of Parker consisted of the following items: (a) Property taxes on the personal residence of Theresa. (b) Payment to the Government of withholding taxes due from Parker. (c) Payment of petitioners' income taxes. (d) Insurance on Theresa's personal residence. During the years 1952 to the present time, an account has been maintained in the ledger of the corporation to which has been charged all of Parker's personal withdrawals. This account has been entitled variously throughout said period as *15 "Accounts Receivable-P.A.E.," "Accounts Receivable-P. A. Eckles," "Notes and Accounts-Officers," or "Officers' Accounts." The charge balance of Parker's withdrawal account immediately prior to the close of the last business day of the years ended December 31, 1952 through 1960 and the net personal withdrawals made by Parker from the corporation in each of these years is as follows: Yearly Net
Balance as of
Personal
Year
December 31
Withdrawals
1952
$ 36,623.49
$ 36,623.49
1953
78,094.77
41,471.28
1954
97,936.58
19,841.81
1955
124,327.64
26,391.06
1956
173,827.64
49,500.00
1957
$197,327.64
$ 23,500.00
1958
218,827.64
21,500.00
1959
232,652.46
13,824.82
1960
232,652.46
Total
$232,652.46
On the last business day of the calendar years 1952 through 1957, Parker arranged with the Bank of America wherein the corporation maintained its business account to have the bank transfer funds to the account of the corporation in the amount of the then existing yearend balance in Parker's withdrawal account. The yearend transactions took the form of loans by the bank to Parker, individually. With respect to the years 1952 through 1956, *16 these loans were evidenced by Parker's promissory note and by a cashier's check from the Bank of America in the amount of the loan. On the last business day of 1952, the cashier's check was deposited in Parker's personal account at the Security First National Bank. Concurrently therewith Parker issued a check on his personal account to the order of the corporation in the amount of the balance in his corporate withdrawal account which check was immediately deposited in the corporation's account at the Bank of America. In all other instances (1953 through 1956) the cashiers' checks were deposited directly to the corporation's Bank of America account at the time the loan was obtained (without routing the proceeds of the cashiers' checks through Parker's personal account maintained by him in the Security First National Bank). The 1957 loan was evidenced by Parker's promissory note and a bookkeeping entry on the books of the Bank of America crediting the amount of the loan as a deposit to the corporation's bank account (without the issuance of a cashier's check by the bank). On January 14, 1953, and on the first business days of 1954 through 1958, Parker caused the corporation to issue *17 a check payable to him in the approximate amount of the loan obtained from the bank at the end of the prior year (except for the January 14, 1953, check which was approximately $7,400 in excess of the loan). These checks, with the exception of the year 1956, were endorsed by Parker and delivered on the same day to the bank as payment for the loan and interest thereon; and concurrently therewith the Bank of America canceled the promissory note previously executed by Parker. On January 4, 1956, the procedure followed by Parker differed slightly in that he deposited the corporation's check made payable to himself in his Security First National Bank account and concurrently therewith drew a check on his personal account payable to the order of the Bank of America in the amount of the loan plus interest and immediately delivered this personal check to the Bank of America as payment for the loan. The "yearend transactions" were reflected on the corporate books by an entry which closed out the then existing balance in Parker's withdrawal account at the end of a particular year and another entry at the beginning of the following year which reinstated as the opening balance in the account *18 the closing balance for the prior year. The yearend transaction procedure previously described was not followed by Parker at the end of the years 1958, 1959, or 1960. He was unable to obtain any loan from the Bank of America and made no effort to obtain any loan from another bank or other source. The corporate and personal financial statements submitted by Parker to the Bank of America were dated as of a time other than at the close of a particular calendar year. However, the financial statements so submitted do not disclose any amounts due from Parker and/or Theresa to the corporation even though the forms provide a specifically designated place therefor. In addition, Parker's personal financial statements list as his assets various securities, the 4270 S. Vermont property, and Theresa's home at 11155 Montana Avenue, Los Angeles, all of which assets were either wholly or partly owned by Theresa. In all instances, except 1952, the loans obtained by Parker from the Bank of America in connection with the yearend transactions had maturity periods of 2 to 5 days. The maturity period of the 1952 loan was 15 days. All of these yearend loans were obtained on the last business day of *19 the year and, with the single exception of the 1952 loan, were repaid on the first business day of the following year. At the time Parker obtained the various loans from the Bank of America in connection with the yearend transactions his sole contemplated source of funds for repayment of these loans was the corporation. Parker's purpose in obtaining these yearend bank loans was to provide an impression that his personal withdrawals, in fact, represented loans from the corporation which, in fact, were being repaid at the end of the year. It was Parker's intention that the yearend bank loans would provide a bookkeeping vehicle whereby the balance in his withdrawal account at the end of a particular year would not be reflected on the books of the corporation. By means of this plan Parker hoped and expected to obtain full and unrestricted ownership, use, and enjoyment of the corporation's surplus funds. During the years in question Parker gambled heavily. A substantial portion of the cash withdrawals reflected in Parker's withdrawal account during the years 1952 through 1959 were utilized by him to finance his various gambling activities. Parker's principal gambling activities during *20 the years in question consisted of legalized on-the-track betting at race tracks in and around Los Angeles. His other gambling activities consisted principally of gin rummy and dice games with acquaintances in the Los Angeles area and various forms of gambling in Las Vegas, Nevada. Parker had an account with the turf clubs at Hollywood Park, Santa Anita, and Del Mar. He customarily carried $500 to $1,000 of pocket money as an initial gambling stake. On some occasions, however, Parker carried as much as $10,000 of pocket money with him to the track which pocket money was obtained by cashing various of the salary, bonus, rent, or personal withdrawal checks received from the corporation. If these pocket money funds were lost, Parker would cash additional checks at the turf club to provide him with further betting funds. At the end of the day he would customarily redeem all of the individual checks which he had issued on that day by using cash on hand in excess of $500 or $1,000 to the extent that such excess was available and then substituting a single check for the balance of the individual checks not redeemed by cash. Parker won varying sums of money on many of the days that he *21 attended the race tracks during the years in question. On his winning days at the race track he would upon occasion win $2,000 to $3,000 and he won as much as $7,000 on one such occasion. During the years in question Parker on various occasions played gin rummy and dice for high stakes with various of his acquaintances. On some of these occasions he won. Parker either deposited his gambling winnings in his personal account at the Security First National Bank or retained the winnings as pocket money to be used for gambling or personal expenses. During the years in question and subsequent thereto Parker either deposited in his personal checking account or cashed all of the rental, expense reimbursement, and salary checks received from the corporation. Parker either cashed, or in some other way appropriated for his own use, the bonus payments received from the corporation in 1952, 1953, and 1956 in the amounts of $17,920, $18,610.13, and $7,748.04, respectively (less payroll deductions for the bonuses paid in 1952 and 1956). During the years in question the balance in Parker's personal checking account at Security First National Bank customarily ranged from $1,000 to $5,000. *22 At times, however, the balance was substantially higher. In no instance during the years in question and subsequent thereto were any of the salary, rental, or expense reimbursement checks received by Parker ever used or applied on account of his personal withdrawals. Neither during the years in question nor subsequent thereto did Parker use or apply his gambling winnings as a payment on account of his personal withdrawals. Neither during the years in question nor subsequent thereto were any other moneys or other assets owned by Parker ever used or applied by him as payment on account of his personal withdrawals. The only amounts due to Parker from the corporation which were ever credited at any time by the corporation on account of the personal withdrawals or balances reflected in the Parker A. Eckles account were a $3,584 withholding tax adjustment in 1953 and the bonuses payable in 1954 and 1955 in the amounts of $9,528.59 and $4,261.44, respectively. However, in the same respective years but prior to the dates on which the aforementioned bonuses payable were credited to Parker's withdrawal account, personal withdrawals of cash (excluding the January 4, 1954, and January 1, 1955, withdrawals *23 relative to the yearend transactions) had been made by Parker in excess of the amount of the bonus credit for the particular year. With the exception of the credits at the end of each year relative to the yearend transactions and the credits described above, the only credits to the account during the years 1952 through 1960 were an unexplained entry in August of 1952 in the amount of $1,000 and miscellaneous journal entries in 1952, 1953, and 1954 to correct for prior charge entries erroneously posted to the account. The corporation did not accrue any interest with respect to any of his personal withdrawals and Parker at no time paid any interest with respect thereto. No security was ever given by Parker with respect to his personal withdrawals. During the years in question and subsequent thereto, all of the moneys received by Parker from the corporation, namely, salaries, bonuses, rentals, expense reimbursements, nd personal withdrawals were used by Parker solely to pay for his living expenses, to support Theresa, and to finance his gambling ventures. At the end of each of the years 1948 through 1958, the earned surplus of the corporation which was at least equal to its *24 accumulated earnings and profits was as follows: 1948
$ 34,080.63
1949
107,077.46
1950
218,570.69
1951
223,336.63
1952
243,557.02
1953
275,981.41
1954
296,562.72
1955
327,587.02
1956
326,453.79
1957
317,930.91
1958
311,450.22
At no time from its organization in 1948 through the present were any formal dividends declared or paid by the corporation to its shareholders. Theresa through her attorney was aware of Parker's personal withdrawals from the corporation as early as 1952. Theresa had no knowledge of the operations of the corporation prior to October 1959 and was fully content to allow Parker, in his sole discretion, to do with the corporation as he saw fit. Neither the corporation nor Theresa Eckles, acting on her own behalf or on behalf of the corporation, has at any time either before or after October 1959 taken any legal action to recover any amounts or portions thereof withdrawn by Parker from the corporation as personal withdrawals. Parker was never obligated nor did he intend to repay any or all of the personal withdrawals made by him from the corporation. Parker at all times had unrestricted ownership and use of all of the *25 aforementioned personal withdrawals. The personal withdrawals made by Parker from the corporation charged to his withdrawal account constituted taxable dividend income to petitioners for the years and in the amounts hereinafter set forth: Year
Amount
1952
$36,623.49
1953
41,471.28
1954
19,841.81
1955
26,391.06
1956
49,500.00
1957
23,500.00
1958
21,500.00
The following is a summary of the travel and entertainment expense ledger accounts of the corporation showing the total yearly amounts paid directly to Parker as reimbursement for said expenses and other amounts paid directly to third parties for such expenses: Payees
1952
1953
1954
1955
Parker A. Eckles
$4,105.00
$4,877.25
$4,997.00
$ 835.00
Turf and Country
400.20
1,114.50
842.16
838.76
Clubs
Liquor
248.35
450.87
186.73
341.80
Hotels
229.12
241.67
76.19
Restaurants
1,354.19
1,703.04
2,165.78
2,065.67
Miscellaneous
426.57
562.18
499.20
Payees
1956
1957
1958
1959
Parker A. Eckles
$ 750.00
$ 500.00
Turf and Country
420.58
$ 169.08
180.00
Clubs
Liquor
200.97
Hotels
Restaurants
1,024.92
806.55
423.46
$ 74.94
Miscellaneous
*26 We find such amounts to have been paid as above indicated. In his deficiency notices for the years 1953 and 1955 respondent has added to Parker's gross taxable income the respective amounts of $2,815 and $460 as dividend receipts from the corporation. These additions to income are claimed by respondent to have been obtained by Parker through overstatement of the amounts of reimbursable expenditures made by him in its behalf. We find the above amounts constitute additional receipts by Parker for the years 1953 and 1955 which are in the nature of dividends. In his returns for each taxable year 1952 through 1955, Parker has deducted $2,400 and, in 1956, $1,000 as expenditures of ordinary and necessary business expenses made by him in behalf of the corporation for which he was not reimbursed. Respondent has for each such year disallowed such deduction. Had he sought reimbursement from the corporation, such amounts would have been reimbursed. His failure to seek reimbursement was for the reason that in each instance he forgot to do so. Such expenditures were not the ordinary and necessary business expenses of Parker, but were the expenses of the corporation. Opinion Our findings *27 of fact are dispositive of the issues here remaining to be resolved. With respect to the personal withdrawals of Parker from the corporation concerning which corporate account was kept, the record is devoid of any evidence that they were other than amounts paid to or for his personal use and benefit. Except for his testimony that he considered such withdrawals constituted borrowed money when withdrawn and that he still so considers them, the record is also devoid of any affirmative evidence that his withdrawals were loans to him by the corporation. The great preponderance of credible affirmative evidence belies his oral testimony. Parker was, in substance, in complete control of the corporation with the knowledge and consent of Theresa, the only other stockholder. She knew he was using funds emanating from the corporation for gambling purposes as early as 1952, the first year at issue. To here argue that she had no such knowledge because her legal representative (who had such knowledge) had not informed her is incredible, and the record does not support such a contention. No written evidence of a debtor-creditor relationship between Parker and the corporation exists except the fact *28 that on the corporate books his withdrawal account is treated as an account receivable. This is not sufficient evidence upon which to base a finding of a debtor-creditor relationship in the light of existing circumstances. William C. Baird, 25 T.C. 387; Clark v. Commissioner, 266 F. 2d 698 (C.A. 9). Parker's acts or failure to act subsequent to and at the time of his withdrawals do not support his contention that the withdrawals were actually borrowings. His acts or failure to act belies any intent on his part to repay the moneys withdrawn. He received a regular salary, rentals, and bonus from the corporation plus at least occasional substantial winnings from his gambling activities, yet none of these receipts were used to repay his withdrawals. The allocation of his bonus to his withdrawal account in 1953 and 1955 was of no substance for the reason that he had, before each such application, far exceeded the amount of each in his withdrawals. The yearend transactions whereby he ostensibly paid his withdrawal account in full with borrowed money are also without substance for he but repaid such borrowings with withdrawals from the corporation. Such transactions *29 are to be viewed, we think, only as shams for the purpose of disguising the distribution to him of corporate profit. Petitioners' burden of proof with respect to the contention that respondent has wrongfully added to taxable income a portion of the amounts paid to Parker as reimbursed business expense by the corporation is to establish that such expense was paid, that the expenditures were for the benefit of the corporation as distinguished from Parker's personal benefit and that the payments by the corporation to him were not distributions of profits in the nature of dividends. Petitioners have failed to sustain this burden. The corporation was managed and completely controlled by Parker. The record does not disclose any check or auditing procedure with respect to his statements of travel and entertainment expense. It is clear that the corporate profits were available for and were used by him for his personal benefit generally. Coupled with his admitted gambling proclivities this situation requires close scrutiny of any flow of corporate profit to Parker in order to assure that what was actually income to him does not avoid taxation through its disguise as nontaxable reimbursements. *30 He has testified that the involved expenditures were made for the benefit of the corporation, but his testimony is unverified and we do not believe it. Although he has generally identified the relationship with the corporation of persons he entertained, he has not specifically identified any individual or occasion with the result that specific inquiry as to any resulting benefit to the corporation may not be made. The record as well supports the proposition that the persons entertained were his friends and acquaintances and the occasions merely social without business motivation or result. We have for failure of proof above noted and for failure to show any other nontaxable character of the corporate payments to Parker which have been added to income for the years 1953 and 1955 found as a fact that they are taxable to petitioners as distributions of corporate profit in the nature of dividends. The same burden of proof exists with respect to amounts of alleged "forgotten" and therefore nonreimbursed expense taken as a deduction by Parker for the years 1952-1956. In addition, he must show such expense to be his as distinguished from that of the corporation. He has failed in his burden *31 on all counts. As with the reimbursed expense above discussed, he has failed to offer proof of sufficient specificity so that inquiry as to the business character thereof may be made. In any event, however, petitioners do not dispute the proposition that such expenses, assuming their actual payment and business character, are those of the corporation, not petitioners'. Petitioners may not convert corporate business expense to their personal business expense merely by failing to seek reimbursement thereof. Earl M. Coplon et al. v. Commissioner, 277 F. 2d 534 (C.A. 6), affirming a memorandum opinion of this Court; Horace E. Podems, 24 T.C. 21. We therefore find it unnecessary to determine whether such expenses were actually paid or the nature thereof. At the hearing hereof petitioners conceded the correctness of additions to tax under section 294(d)(1) of the 1939 Code for the years 1952 and 1953 and under section 294(d)(2) for 1954 reserving their right "to establish reasonable cause." Reasonable cause is a defense with respect to additions to tax under subsection (d)(1) but has no application to subsection (d)(2). Petitioners have offered no proof whatsoever *32 tending to show reasonable cause for their failure to file declarations of their estimated tax for 1952 and 1953. We assume therefore that they have abandoned this issue. Because of concessions of the parties, Decisions will be entered under Rule 50.