Theodore B. Livernois Trust of May 2, 1958, Theodore B. Livernois, Jr., and Albert L. Grigsby, Jr., Trustees v. Commissioner. Alma G. Livernois v. Commissioner.
Livernois Trust v. Commissioner
Docket Nos. 574-66, 576-66.
United States Tax Court
T.C. Memo 1969-111; 1969 Tax Ct. Memo LEXIS 184; 28 T.C.M. (CCH) 583; T.C.M. (RIA) 69111; May 29, 1969, Filed Jerry D. Luptak and Basil M. Briggs, 3000 Guardian Bldg., Detroit, Mich., for the petitioners. Joseph F. Dillon, for the respondent. FAY
Memorandum Findings of Fact and Opinion FAY, Judge: Respondent determined deficiencies in the Federal income tax of petitioners as follows: Dkt. No.
Petitioner
Year
Amount
574-66
Theodore B. Livernois
Trust of May 2, 1958
1959
$17,828.95
1960
55,593.37
1961
23,345.17
1962
9,898.34
1963
22,568.74
576-66
Alma G. Livernois
1959
16,983.94
1960
45,595.30
1961
17,731.59
1962
7,845.69
1963
21,433.20
Various adjustments raised in the notices of deficiency have been conceded by the petitioners. The issues for determination are (1) whether certain corporate payments to the Theodore B. Livernois *188 Trust of May 2, 1958, constituted taxable dividend income, (2) what is the taxable income of the Theodore B. Livernois Trust of May 2, 1958, during the years in issue, and (3) what are the tax consequences to Alma G. Livernois as a beneficiary of the Theodore B. Livernois Trust of May 2, 1958, during the years in issue. 584 Findings of Fact Some of the facts have been stipulated. The stipulation of facts, together with the exhibits attached thereto, is incorporated herein by this reference. Theodore B. Livernois, Sr. (hereinafter referred to as Theodore Sr.) was the settlor of the Theodore B. Livernois Trust of May 2, 1958 (hereinafter referred to as the Trust). During the years in issue, the trustees of the Trust were Theodore B. Livernois, Jr. (hereinafter referred to as Theodore Jr.) and Albert L. Grigsby, Jr. (hereinafter referred to as Albert), a son-in-law of Theodore Sr. The Trust's Federal income tax returns for the taxable years 1959 through 1963 were filed with the district director of internal revenue, Detroit, Michigan. The legal residence of the Trust on the date the petition herein was filed was Detroit. Alma G. Livernois (hereinafter referred to as Alma) *189 had her legal residence at Birmingham, Michigan, at the time the petition herein was filed. Alma's Federal income tax returns for the taxable years 1959 through 1963 were filed with the district director of internal revenue, Detroit, Michigan. Theodore Sr. created the Trust on May 2, 1958. The instrument creating the Trust (hereinafter referred to as the Trust Agreement) is here quoted in its entirety, except for signatures and an acknowledgment: TRUST AGREEMENT This agreement made this 2nd day of May, 1958, by and between Theodore B. Livernois of the city of Lexington, Michigan, hereinafter designated as "Grantor", and Theodore B. Livernois, Sr., Theodore B. Livernois, Jr., Edward G. DeGree and Albert L. Grigsby, hereinafter called "Trustees", WITNESSETH: WHEREAS, Grantor is the present owner of certain property, schedule whereof is attached hereto identifying such property, and desires to make provision for the maintenance, investment and the ultimate transfer of such property to certain beneficiaries; NOW, THEREFORE, in consideration of the premises Grantor does hereby assign, transfer, grant and pay over all of said property and interests in property set forth upon *190 the annexed schedule to Theodore B. Livernois, Sr., Theodore B. Livernois, Jr., Edward G. DeGree and Albert L. Grigsby in trust for the purposes hereinafter specified. The scheduled property together with such other property as Grantor may from time to time transfer to the Trustees shall constitute trust funds which shall be administered as follows: 1.1 The Trustees shall pay to Theodore B. Livernois, Sr., during his lifetime the entire net income from the trust property together with any or all of the principal thereof he may from time to time request or desire. 1.2 Upon the death of Theodore B. Livernois, Sr., the surviving Trustees shall pay the expenses of his last illness, funeral and burial, his debts and all taxes which shall be occasioned by any property transferred by reason of his death, and shall then continue the property in trust for the use and benefit of Grantor's wife, Alma Livernois, if she survives Grantor; 1.3 If Grantor's wife, Alma Livernois, survives the Grantor then the surviving Trustees shall pay to her the entire net income from the trust property and estate in convenient installments. If in the opinion of the Trustees, the income herein provided together *191 with receipts from other sources, shall not be sufficient suitably to support and maintain Grantor's wife, or in case of any emergency, such as illness, accident or other extraordinary distress, then the Trustees shall, if they deem it advisable so to do, use and expend such part of the principal of the trust as may be necessary to make up such deficiency or to meet such emergency; 1.4 Upon the death of Grantor's wife, Alma Livernois, the trust property shall be divided into three (3) equal shares: one for the use and benefit of Grantor's son Theodore B. Livernois, Jr.; one for the use and benefit of Grantor's daughter Nannette Jean Livernois; and, one for the use and benefit of Grantor's daughter Noel Glenn Livernois; 2. Each of said trusts shall be administered as follows: 2.1 The surviving Trustees shall pay to each said beneficiary the entire net income from his or her trust property and estate until such beneficiary attains the age of forty-five (45) years. In the event of illness, accident or any emergency befalling said beneficiary, the Trustees in their uncontrolled discretion may use such part of the principal of said beneficiary's trust property as may be necessary *192 in their judgment to alleviate the situation; 2.2 As and when each beneficiary attains the age of forty-five (45) the surviving Trustees shall assign, transfer, convey and pay over to him or her the entire balance of his or her trust property free and discharged from the trust hereof; 585 2.3 In the event such beneficiary shall die after the commencement of his or her trust but before he or she shall have received his or her entire share thereof, the remainder of the trust property shall be continued in trust for such beneficiary's issue, if any, taking by right of representation and the trust for such beneficiary's issue shall be administered as follows: (a) The Trustees shall use and expend such part of the trust property as may be needed for the support, maintenance and education of said issue during their minority; (b) As and when each child, comprising the issue of such deceased child of Grantor, shall attain the age of twenty-one (21) years he or she shall receive outright his or her entire share of the trust property taking by right of representation; 2.4 In the event any beneficiary, child of Grantor, shall die after the commencement of his or her trust but before *193 receiving his or her entire share thereof, leaving no issue surviving him or her, the balance of his or her trust property and estate shall be added to and become a part of the trusts established for such child's brother, sisters, or sister and brother, and such property shall be governed by the terms of the trust or trusts to which it is transferred. If any beneficiary of the trust or trusts to which such property is transferred has already attained the age of forty-five (45) years, then the aforesaid property shall be transferred outright to such beneficiary rather than to be transferred to any trust. 2.5 In the event of any child of Grantor predeceasing Grantor leaving issue surviving him or her, the property which would have been placed in trust for such child if living, shall be placed in trust for the issue of such child and shall be administered in accordance with the provisions of paragraph 2.3, (a) and (b); TRUST POWERS 3.1 Grantor confers upon Theodore B. Livernois Sr., Trustee, full and complete power and authority during his lifetime, to take possession of all of the trust property, register and record titles thereof solely in his name as Trustee, or at his option *194 in the name of a nominee, to manage the same, to collect all income thereon, to invest and reinvest the trust property, to sell, lease, hypothecate or dispose of any property upon such terms as he in his uncontrolled discretion may see fit, and to execute and deliver any and all instruments of assignment, sale, lease, conveyance and hypothecation which may be necessary in the premises, and, in general, and without limitation, to do and perform any and all acts as Trustee with respect to the trust property, to the exclusion of any participation whatsoever of anyone else, in the same manner as he could have done immediately prior to the execution of this instrument. 3.2 After the death of Theodore B. Livernois Sr., Trustee, the surviving Trustees shall have power to manage the trusts, to invest and reinvest the trust property and to sell, lease, assign, transfer, hypothecate and dispose of the trust property, or any part thereof, in any manner which they in their discretion may deem to be to the best interests of the respective beneficiaries, and in the meantime to collect all income from the trust property, and to execute and to deliver any and all instruments of assignment, sale, *195 lease, conveyance and hypothecation which may be necessary in the premises. The successor Trustees shall have no authority or power whatsoever in the premises during the lifetime of Theodore B. Livernois Sr., Trustee; 4.1 After the death of Theodore B. Livernois Sr., Trustee, there shall at all times be two (2) successor Trustees until the termination of all trusts hereunder. Upon the death, resignation or inability to act of the successor Trustees hereinbefore named, then the following persons shall in the order named when necessary succeed with the duty of successor Trustee with all of the authority conferred upon their predecessor: Nannette Jean Livernois Noel Glenn Livernois Thomas Patton 5.1 The Trustees shall keep a separate book account concerning each trust estate or allocated part and the respective beneficiaries thereof, in such manner so as to show each of said trust estates has been definitely allocated to the respective beneficiaries thereof. As to any property incapable of exact division comprising the trust property, it shall not be necessary for the Trustees actually and physically to divide the same into as many parts as there may be trusts, but an undivided *196 part thereof may be deemed and shall be duly evidenced by appropriate book entries to have been definitely allocated to each of the several trusts; 6.1 Inasmuch as Grantor has made provision for the ultimate disposition of his property, he does hereby revoke any and all Wills which he may have heretofore executed; 7.1 Grantor Theodore B. Livernois Sr. reserves the right to alter, amend and revoke this agreement at any time. IN WITNESS WHEREOF the parties hereto have executed this agreement on the day and date first above written. 586 On May 2, 1958, Theodore Sr., as trustee of the Trust, organized Teal, Inc., a Michigan corporation, to act as the nominee for the Trust. Theodore Sr., Albert, and Edward G. DeGree constituted Teal's board of directors. Since 1959 Theodore Jr. and Albert have been officers and directors of Teal. During the years relevant hereto, Teal's only activity was as the nominee of the Trust. Teal therefore had no separate significance for Federal income tax purposes and its returns so indicated. We accordingly ignore Teal's existence hereinafter and proceed as if the Trust's affairs had been handled through the Trust rather than through Teal. On or *197 about May 6, 1958, Theodore Sr. transferred the following properties to the Trust: (a) 1,000 shares of common stock of MichiganOhio Supply Company, a Michigan corporation (hereinafter referred to as Supply), 3,000 shares of common stock of Ohio Lumber and Face Brick Company, an Ohio corporation (hereinafter referred to as Ohio Lumber), and 500 shares of common stock of Style King Door Company, a Michigan corporation (hereinafter referred to as Style King), being all of the issued and outstanding capital stock of the three named corporations; (b) 700 shares of common stock of Blue Water Beach Development Company, a Michigan corporation (hereinafter referred to as Blue Water), being 70 per cent of the issued and outstanding capital stock of said corporation, the balance of which was owned equally by Theodore Sr.'s three children; (c) 225 shares of common stock and 225 shares of preferred stock of Greenfield Industries, Inc., a Michigan corporation (hereinafter referred to as Greenfield), being 75 percent of each class of capital stock of said corporation, the balance of which was owned equally by Theodore Sr.'s three children; (d) 2,450 shares of common stock of Darlington Face *198 Brick Company, a Pennsylvania corporation, being 50 percent of the issued and outstanding capital stock of said corporation, the balance of which was owned by Edward C. Myers, who was unrelated to Theodore Sr.; (e) 1,000 shares of Class A stock and 400 shares of Class B stock of Kish Industries, Inc., and 8 shares of common stock of Republic Steel Company, both of which are listed securities; and (f) A house and lots located in Lexington, Michigan, described as Lots 13, 14, and 15, Plat of Ballantrae, part of Lot FRL, T 10 N D. R 17 E.Sec. 7. Greenfield was in the business of purchasing and selling building materials to contractors in the Detroit area. About 50 to 60 percent of these materials and supplies were purchased ultimately from Ohio Lumber. Ohio Lumber was in the business of manufacturing brick which it sold principally to Supply, a transportation company. Supply transported the brick purchased from Ohio Lumber's Ohio plant to Michigan where it sold the brick to Grenfield at cost plus a freight charge. Ohio Lumber sold its plant in 1958 and thereafter acted in a brokerage capacity in its sales to Supply. Blue Water was organized to purchase, develop, and sell lake *199 lots on Lake Huron, Michigan. Style King was in the business of manufacturing doors until 1954, at which time it became permanently inactive. Greenfield, Ohio Lumber, Supply, Blue Water, and Style King are hereinafter referred to collectively as the Corporations. The officers of the Corporations were as follows: Greenfield - Theodore Jr., Albert, Edna Forman, and Thomas Patton [1]
Ohio Lumber - Theodore Jr. and Albert Supply - Theodore Jr., Albert, Thomas Patton, and Blake Smith Blue Water - Theodore Jr., Albert, and Thomas Patton Style King - Theodore Jr. and Albert On June 2, 1958, Theodore Sr. suffered an accidental gunshot wound. He died on June 10, 1958. Theodore Sr. died intestate. An intestacy proceeding was instituted in the Probate Court for the County of Oakland, State of Michigan. Theodore Jr. was appointed as the administrator of the probate estate (hereinafter referred to as the Estate). The Estate had assets of $24,076.34. Its liabilities greatly exceeded its assets. This was due to the fact that Theodore Sr. had transdue his principal assets to the Trust. The Federal estate tax return filed by *200 the Estate disclosed a Federal estate tax liability of $46,590.48, of which $13,333.41 was paid on the date the return was filed. The 587 return was audited and a deficiency of $61,086.95 was assessed on November 13, 1962. The balance of the liability disclosed on the return and the additional deficiency were paid in installments. On August 12, 1960, a joint Federal income tax assessment in the amount of $123,061.41 was made against Theodore Sr., deceased, and Alma for income tax liabilities for the taxable years 1950 through 1958 and for fraud penalties for the taxable years 1950 through 1955. This liability was ultimately paid in installments which were completed by the end of 1962. After the joint income tax assessment of $123,061.41 for 1950 to 1958 was made, Theodore Jr., Albert, and James C. Eckmeter, the accountant for the Corporations, arranged a meeting with the Pontiac, Michigan, office of the Internal Revenue Service. They discussed a compromise or time payment plan. The Service refused to accept the plan. It took the position that certain assets held by the Trust and the Corporations could be liquidated or mortgaged to pay the income tax assessment. The Service *201 threatened to file liens against the Corporations if the income tax assessment was not paid. The Corporations believed that the Service intended to file liens against them and they believed that such liens would have ruined their businesses. Pursuant to paragraph 1.2 of the Trust Agreement, the Trust was obligated to pay the above-described estate and income tax liabilities. Pursuant to the same paragraph, the Trust was also obligated to pay expenses of the Estate such as the expenses of Theodore Sr.'s last illness. The Trust, however, did not have sufficient liquid funds with which to meet these obligations. Theodore Jr., as administrator of the Estate and a trustee of the Trust, decided that the money would have to be obtained from the Corporations. The Corporations were agreeable to this. They were willing to give money to the Trust to avoid having the Internal Revenue Service file liens against them and thereby endanger the existence of their businesses. Pursuant to this arrangement, the Trust received the following amounts of money from the Corporations in the indicated years: Name of
1959
1960
1961
1962
1963
Corporation
Supply
$ 59,011.39
$ 52,766.95
$ 52,142.37
$ 63,423.15
$ 51,890.74
Ohio Lumber
477,122.42
391,764.54
369,436.24
352,438.80
332,156.21
Greenfield
111,181.08
97,929.67
100,141.39
103,279.82
109,490.78
Blue Water
86,857.56
105,871.37
119,598.82
128,247.84
139,238.23
Style King
3,495.55
5,150.09
7,398.70
(11,336.16)
(25,446.67)
*202 In 1964 and 1965 the Trust received an additional $71,000 from the Corporations. As another way of raising money, the Trust in 1960 mortgaged the property located in Lexington for $20,000 with the State Bank of Croswell, Croswell, Michigan. It also sold the Republic Steel Company common stock and the Class A and Class B shares in Kish Industries, Inc., in October 1960 for $424.02 and $471.76, respectively. In 1960 the Darlington Face Brick Company was liquidated and the Trust received $4,644 at that time and an additional $162.20 in 1962. The mortgage loan and the sales proceeds were applied by the Trust to the income tax assessment. The liquidation distribution was used in the amount of $4,000 to return money from the Trust to the following corporations: Supply $1,600, Greenfield $1,000, and Blue Water $1,400. On December 1, 1960, Ohio Lumber, the owner of an undivided 50 percent interest in property in Riverview, Michigan, borrowed $70,000 on a two-year note at 1 percent interest per month from Shaberman Investment Company (hereinafter referred to as Shaberman). Ohio Lumber gave Shaberman a two-year option to purchase a 15 percent undivided interest (30 percent of its 50 percent *203 undivided interest) for $72,300. The option was extended to December 1, 1963. The proceeds of the $70,000 loan were distributed to the Trust which applied it against the income tax assessment. Shaberman exercised the option on September 13, 1963. It purchased a 15 percent 588 undivided interest in the property in satisfaction of the note plus the interest due thereon from June 1, 1963. Prior to the time of this exercise, no principal payments had been made by Ohio Lumber. On September 23, 1963, Ohio Lumber joined with the other owners of the property to sell it on a land contract to Practical Home Builders. The purchase price was $956,170.80, with $75,000 down and the balance to be paid in nine equal annual installments of $99,000 with interest at 6 percent. [2]Ohio Lumber's share of the sales price was $334,659.78. It realized a profit of $155,069.62 which it reported on the installment basis. On October 1, 1963, Ohio Lumber again borrowed $70,000 from Shaberman. The loan was payable in two years with interest at 1 percent per month. Ohio Lumber mortgaged its land contract *204 interest as security for the loan. On the same day Ohio Lumber distributed to the Trust the sum of $38,000. On the succeeding day the Trust paid $37,492.82 of estate taxes. In connection with the Trust's receipts from the Corporations, Albert, in his capacity as a trustee, executed documents evidencing the transfer of money to the Trust. The documents were in the form of demand notes bearing dates beginning June 17, 1958, and bearing interest of 6 percent per annum. As of May 16, 1967, no interest had been paid by the Trust. More-over, the Corporations had not recorded any interest due on the "notes," although the "notes" were recorded on their books as receivables. In no case was payment ever demanded by the Corporations. With the exception of payments totaling $4,000 during 1960, none of the "notes" has been paid by the Trust. The amount of the unpaid "notes" as of December 31, 1963, was $290,834.41. In addition to the receipts from the Corporations, the Trust had the following cash receipts during the years here in issue: Nature of Item
1958
1959
1960
1961
1962
1963
Dividends,
$12.00
$ 24.00
$ 24.00
Republic stock
Dividends, Kish
30.00
Industries
Darlington
4,644.00
$ 162.20
Liquidation
Dividend
Sale of
895.78
Republic Steel
& Kish stock
Bond interest
25.00
50.00
50.00
$ 50.00
25.00
Receipt on
20,000.00
Mortgaging of
(178.50)
property
Mortgage Costs
Damage to
75.82
Property
Refund of
1,741.67
Deposit
Redemption of
1,000.00
Bond
Sale of Club
$2,320.00
Membership
$37.00
$104.00
$25,435.28
$1,867.49
$1,187.20
$2,320.00
*205 The Trust therefore had total receipts of $325,785.38 for the years in question, detailed as follows: Receipts from the
Other
Year
Corporations
Receipts
Total
1958
$ 22,000.00
$ 37.00
$ 22,037.00
1959
39,833.41
104.00
39,937.41
1960
95,000.00
25,435.28
120,435.28
1961
$50,500.00
$1,867.49
$52,367.49
1962
29,501.00
1,187.20
30,688.20
1963
58,000.00
2,320.00
60,320.00
During this same period, the Trust made the following cash disbursements: 589 1958
1959
1960
1961
Debts and bills of last
$ 1,327.65
$ 81.00
ill- ness of dece- dent
White Chapel
1,420.00
1,680.00
$ 1,680.00
$ 840.00
Plot-Cemetery
Funeral Cost
9,114.23
Inc. taxes & in- terest
70,895.78
50,301.83
Est. taxes & int.
13,333.41
4,985.51
4,837.70
Mich. Inher. taxes
6,974.03
Appraisal fee re estate
175.00
Legal fees re est.
A.G. Livernois
6,250.00
14,890.00
14,790.00
10,065.00
Lexington prop. salaries,
1,650.00
2,586.52
2,367.00
2,300.00
taxes, exp.
Household maid
850.00
160.00
447.39
1,444.16
Insurance
694.00
FOAB Tax
54.90
112.02
77.66
122.90
Club dues
184.00
490.00
480.00
280.00
Auto license
16.80
16.80
Intang. tax
65.95
68.19
66.52
Corp. franch. fee
12.00
12.00
12.00
Payment to Corps.
1,000.00
Greenfield
Blue Water
1,400.00
Supply
1,600.00
Mortgage Prin.
1,505.23
Mortgage Int.
1,159.87
Totals
$21,544.78
$40,576.73
$99,820.33
$72,935.21
*206 1962
1963
Total
Debts and bills of last
$ 1,408.65
ill- ness of dece- dent
White Chapel
6,000.00
Plot-Cemetery
Funeral Cost
9,114.23
Inc. taxes & in- terest
3,329.50
124,527.11
Est. taxes & int.
10,017.45
$42,034.91
75,208.98
Mich. Inher. taxes
3,000.00
9,974.03
Appraisal fee re estate
175.00
Legal fees re est.
5,000.00
5,000.00
A.G. Livernois
7,200.00
7,875.00
61,070.00
Lexington prop. salaries,
2,811.10
2,064.33
13,778.95
taxes, exp.
Household maid
2,901.55
Insurance
226.15
610.40
1,530.55
FOAB Tax
79.12
(56.54)
390.06
Club dues
570.00
2,004.00
Auto license
16.80
50.40
Intang. tax
63.45
61.70
325.81
Corp. franch. fee
12.00
12.00
60.00
Payment to Corps.
1,000.00
Greenfield
Blue Water
1,400.00
Supply
1,600.00
Mortgage Prin.
1,454.80
1,882.83
4,842.86
Mortgage Int.
980.25
1,238.87
3,378.99
Totals
$30,140.62
$60,723.50
$325,741.17
The earned surplus of each of the Corporations for the years in issue was as follows: Name of Corporation
1958
1959
1960
1961
Supply
$22,000.00
$ 9,500.00
$ 2,000.00
Ohio Lumber
20,333.41
70,000.00
$12,000.00
Greenfield
1,000.00
14,000.00
23,500.00
Blue Water
9,000.00
9,000.00
9,000.00
Style King
6,000.00
TOTALS
$22,000.00
$39,833.41
$95,000.00
$50,500.00
*207 Name of Corporation
1962
1963
Totals
Supply
$ 33,500.00
Ohio Lumber
$46,000.00
148,333.41
Greenfield
$26,501.00
11,000.00
76,001.00
Blue Water
3,000.00
1,000.00
31,000.00
Style King
6,000.00
TOTALS
$29,501.00
$58,000.00
$294,834.41
On February 1, 1963, the Probate Court ordered the Estate closed. The final accounting showed an outstanding liability of $52,153.92 to the Trust. The residue of the Estate was assigned to the Trust and credited to the Estate. On its Federal fiduciary income tax returns for the taxable years 1959 through 1963, the Trust did not report its receipts from the Corporations as taxable income. On each of her Federal income tax returns. for the taxable years 1959 through 1963, Alma reported an adjusted gross income of less than $600. In the statutory notices of deficiency for the taxable years 1959 through 1963, respondent treated the Trust's receipts from the Corporations as taxable dividends. Respondent accordingly adjusted the Trust's taxable income for these years. Respondent also adjusted the Trust's taxable income for items other than its receipts from the Corporations. Finally, respondent made several *208 adjustments to Alma's taxable income, including items resulting from her status as a beneficiary of the Trust. Opinion The first issue is whether the Corporations' payments to the Trust were loans or distributions taxable as dividends within sections 301(a) and 316(a). [3] 590 Whether corporate payments are loans or are distributions taxable as dividends is a question of fact to be determined from all the relevant fact and circumstances. Wiese v. Commissioner, 93 F. 2d 921 (C.A. 8, 1938), affirming 35 B.T.A. 701 (1937), certiorari denied 304 U.S. 562 (1938). A particularly relevant fact is the presence or absence of an intention and expectation at the time of the payments that they will be repaid. Noble v. Commissioner, 368 F. 2d 439 (C.A. 9, 1966), affirming a Memorandum Opinion of this Court; Commissioner v. Makransky, 321 F. 2d 598 (C.A. 3, 1963), affirming 36 T.C. 446 (1961). In the Makransky case, the Court of Appeals for the Third Circuit delimited the concept of a loan as follows: *209 While in many cases various factors must be weighed in determining for income tax purposes the true character of a purported loan, there is one essential without which a transaction cannot be recognized as a loan. The parties must have entered into the transaction with the intention that the money advanced be repaid. * * * In Clark v. Commissioner, 266 F. 2d 698 at 711 (C.A. 9, 1959), affirming on this issue a Memorandum Opinion of this Court, the Ninth Circuit in its discussion of this issue from the point of view of the requirements for a dividend stated: To constitute a distribution taxable as a dividend, the benefit received by the shareholder need not be considered as a dividend either by the corporation or its shareholders, declared by the board of directors, nor other formalities of a dividend declaration need be observed, if on all the evidence there is a distribution of available earnings or profits * * * without any expectation of repayment. * * * A comparison of these two quotations readily reveals that the crucial factor is the intention and expectation of repayment. Without this factor a holding that this transaction was a bona fide loan cannot be made. *210 It is also apparent that the converse holding that the distribution is one taxable as a dividend does not require a finding that the parties intended a dividend per se; such a holding is based instead upon the economic realities of the transaction. Noble v. Commissioner, supra. After consideration of all the evidence, we conclude that at the time of the payments there was no intention or expectation that they would be repaid and that they are properly taxable as dividends. We are not persuaded that at the time of the payments the Trust intended to repay the Corporations. The Trust was the sole shareholder of Supply, Ohio Lumber, and Style King. It was the 70 percent majority shareholder of Blue Water and the 75 percent majority shareholder of Greenfield. The balance of the stock of the latter two corporations was owned by Theodore Sr.'s three children. This stock represented substantially all of the Trust's assets. By 1960, due to the disposition of certain other property held by the Trust, the stock was the Trust's sole asset with the exception of a house and lots which had been mortgaged for $20,000. We think it is clear from the record that the Trust had but *211 one source from which it could acquire funds. That source was the Corporations which it controlled. In a factual situation such as this, transactions are subject to the closest scrutiny. See Elliott J. Roschuni, 29 T.C. 1193 (1958), affd. per curiam, 271 F. 2d 267 (C.A. 5, 1959), certiorari denied 362 U.S. 988 (1960). From the date of Theodore Sr.'s death, the Trust has looked to the Corporations whenever and for whatever purpose it required money. The Corporations paid money to the Trust without collateral and without any express limitation as to the ceiling amount of such payments. Though the notes accompanying these payments called for the payment of interest at the rate of 6 percent per annum, no interest was in fact paid to, or accrued by, the Corporations. Nor have there been any significant payments of principal by the Trust to the Corporations. 3a In essence, the trustees have withdrawn from the Corporations whatever money they needed to administer the terms of the Trust Agreement. We hold that the petitioners have not met their burden of demonstrating that there was any real intention or expectation that the monies advanced to the *212 Trust by the Corporations would ever be repaid. The testimony about liquidating Ohio Lumber and Blue Water as part of a repayment plan is vague and unconvincing. Initially there is no evidence that such a 591 plan was conceived when the withdrawal of money from the Corporation began. Nor are we convinced that such a plan was in any way a realistic consideration in the decision to pay the money to the Trust. For the first time on brief petitioners argue that the loans from Ohio Lumber and Blue Water were in reality in furtherance of informal plans of complete liquidation and should be treated under section 311(a) (1). They further argue that to the extent the money advanced by the Corporations was used to pay Federal estate taxes, Michigan inheritance taxes, and funeral and administration expenses of the Estate, they are distributions in redemption of stock under section 303. Aside from the procedural point that these *213 arguments were not raised until briefs were filed, the short answer is that neither of them is supported by the facts. Petitioners have not shown the presence of an informal plan of complete liquidation for the purposes of section 331. Nor have they shown facts to support the existence of a redemption, that is, the acquisition of its shares by a corporation, for the purposes of section 303. In light of the foregoing analyses and because we have found that the earnings and profits of each Corporation exceeded the respective payments, we hold that the corporate payments are taxable as dividends. The last two issues are (1) what is the taxable income of the Trust during the years in issue and (2) what are the tax consequences to Alma as a beneficiary of the Trust during the years in issue. After reading the original and reply briefs, it was not entirely clear to us what questions the parties though were necessary to decide in order to resolve these issues. Based on our own research and what we could cull from the briefs, we formulated a list of questions which we felt were pertinent. On August 27, 1968, we issued an order directing the parties to file simultaneous, supplemental briefs *214 in response to these questions. The supplemental briefs disclosed to us for the first time that the parties were in agreement with respect to several of the questions. We subsequently examined the questions remaining in dispute. We have concluded that it is only necessary to discuss three of these. The rest are rendered moot by our conclusions on the three we discuss. The first question is whether petitioners raised a new issue on brief when they suggested that the Estate is taxable on part of the Trust's receipts. To answer this question, we must reconstruct the positions of the parties at various stages of the case. In the statutory notices of deficiency, respondent claimed that the money which the Trust received from the Corporations constituted dividends, not loans. He accordingly increased the Trust's taxable income. However, he also increased, by the same amounts, Alma's gross income resulting from her status as a beneficiary of the Trust. He thereby took inconsistent positions with respect to the Trust and Alma by denying the Trust a distribution deduction under subchapeter J. In their petitions the Trust and Alma took the position that the Trust's receipts from the Corporations *215 were loans, not dividends. We have examined these petitions closely to determine whether an additional position was taken in them. We have concluded that nothing in the petitions can fairly be taken as raising a second position. In their opening statement, petitioners reasserted their position that the Trust's receipts from the Corporations were loans, not dividends. We have examined their opening statement closely to determine whether an additional position was taken in it. We have concluded that nothing in the opening statement can fairly be taken as raising a second position. Indeed, not even through a tortuous construction can the opening statement be taken as alerting respondent of a second position. This is especially true in the context of remarks by petitioners' counsel, such as the following: The sole issue in controversy is whether certain payments made to Teal, Inc., a Michigan corporation, during these years constitute dividend income to the trust. * * * The sole issue in controversy is whether or not Alma G. Livernois realized as a life income beneficiary distributable net income during 1959 to 1963 in the amounts claimed to be dividends to the trust. * * * In respondent's *216 original brief, he ceased taking inconsistent positions with respect to the Trust and Alma. He acknowledged that the Trust would be entitled to a distribution deduction for amounts treated as received by Alma under subchapter J. This acknowledgment was in effect a concession by respondent, resulting in lower total deficiencies asserted. [4] 592 In petitioners' original brief, they reasserted their position that the Trust's receipts from the Corporations were loans, not dividends. In addition they took a second, alternative position which was inconsistent with their first position. Their second position was that even if the Trust's receipts from the Corporations were dividends, *217 the receipts were ultimately taxable at least in part to a third taxpayer - the Estate. We think petitioners' second position raised a new issue. Their first position concerned the taxability vel non of the Trust's receipts. Their second position assumed the taxability of the receipts and concerned the taxpayer to whom they should ultimately be taxed. We furthermore think that petitioners did not raise the new issue until they filed their original brief. As we state above, we do not think petitioners fairly apprised respondent of their new position prior to filing their original brief. Moreover, the record as a whole can only be taken as obscuring the fact that petitioners intended to take a second position. There is very little evidence that even remotely relates to the position. [5] What evidence there is is vague and confusing. We thus conclude that petitioners raised a new issue when they suggested in their original brief that the Estate is taxable on part of the Trust's receipts. It follows that this issue is not properly *218 before us and that we cannot consider it. Eleanor C. Shomaker, 38 T.C. 192 at 201 (1962). See also William B. Swope, 51 T.C. 442 at 452 (1968). The burden of the two remaining questions is the determination of who is taxable on the Corporations' payments. We have already held that these payments are dividends for Federal tax purposes. It follows that they are gross income to some taxpayer. Section 61(a) (7). We have also decided that we cannot consider the Estate as a potential candidate to be taxable on the payments. It follows that either the Trust, or Alma, or both will be the party who is taxes. Stated another way, one of the following situations must obtain: (1) Alma will be taxed on all the payments and the Trust will be taxed on none, (2) the Trust will be taxed on all the payments and Alma will be taxed on none, or (3) Alma will be taxed on part of the payments and the Trust will also be taxed on part of the payments. 5a The result of our disposition of the two remaining questions is that the third alternative obtains, i.e., Alma will be taxed on part of the payments and the Trust will be taxed on the remainder of the payments. *219 The second question is whether the Corporations' payments to the Trust are "income" as that term is used in section 643 (b). [6] With respect to this question, the case at bar bears a striking resemblance to Harry Makransky, 36 T.C. 446 (1961), affd. 321 F. 2d 598 (C.A. 3, 1963). In Makransky, the grantor of a trust rendered himself insolvent by settling the trust. A creditor of the grantor thereupon threatened to seize the corpus of the trust. During the years pertinent to the case, the sole asset of the trust was all the issued and outstanding stock of a corporation of which the grantor was president. Because of the threatened seizure of this asset, the trustees, with the approval of the Philadelphia County Orphans' Court, caused the corporation to agree to give sufficient money to the grantor to pay his debts. The corporation subsequently fulfilled its agreement by paying money to the grantor and, after his death, to his estate. These transactions were cast in the form of loans from the corporation to the grantor and his estate. This Court, however, held that the corporate payments were dividends to the trust. Its holding was premised on the fact that *220 the purpose of the payments was to preserve the trust corpus in the face of the threatened seizure by the grantor's creditor. 593 After reaching this holding, the Court in Makransky had to decide the question whether the corporate payments were "income" within the meaning of section 643(b) and the regulations under section 162(d) of the Internal Revenue Code of 1939. In connection with this question, the Court quoted parts of the trust indenture which required the trustees to - collect the dividends, interest, rents, issues and profits [from the trust corpus] and after paying all expenses incident to the management of the Trust, to distribute and apply the net income [to the beneficiaries] * * * The Court held that the corporate payments were not "income," stating *221 that - The trustees did not "collect" income generated by the corpus for distribution to the beneficiaries but rather all of the parties with the sanction of the Orphans' Court, caused corporate income to be used to preserve the value of the trust assets. * * * We think Makransky governs the case at bar on the question whether the payments by the Corporations to the Trust are "income." The minor factual differences between the present case and Makransky do not serve to distinguish it. We accordingly hold that the Corporations' payments to the Trust are not "income" as that term is used in section 643(b). 6a
The third question is whether the amounts which the Trust distributed to or paid on behalf of Alma in excess of its "income" were "properly paid" within the meaning of that phrase as it is used in sections 661(a) (2) and 662(a) (2). [7] Respondent's position is that such amounts were "properly paid." Petitioners claim to *222 the contrary. They construe the Trust Agreement as giving Alma no rights in the Trust until all of the Estate's expenses and debts are fully paid. They accordingly argue that the amounts paid to or on behalf of Alma in excess of the Trust's "income" before all of the Estate's expenses and debts were fully paid, were paid contrary to the provisions of the Trust Agreement. Petitioners conclude that such amounts were not "properly paid" within the meaning of that phrase as it is used in section 661 and 662. *223 The question presented involves a construction of the Trust Agreement. We must decide what beneficial interests it creates upon the death of Theodore Sr. The relevant provisions of the Agreement are here quoted: 1.2 Upon the death of Theodore B. Livernois, Sr., the surviving Trustees shall pay the expenses of his last illness, funeral and burial, his debts and all taxes which shall be occasioned by any property transferred by reason of his death, and shall then continue the property in trust for the use and benefit of Grantor's wife, Alma Livernois, if she survives Grantor; 1.3 If Grantor's wife, Alma Livernois, survives the Grantor then the surviving Trustees shall pay to her the entire net income from the trust property and estate in convenient installments. If in the opinion of the Trustees, the income herein provided together with receipts from other sources, shall not be sufficient suitably to support and maintain Grantor's wife, or in case of any emergency, such as illness, accident or other extraordinary distress, then the Trustees shall, if they deem it advisable so to do, use and expend such part of the principal of the trust as may be necessary to make up such deficiency *224 or to meet such emergency; We think the correct construction of these paragraphs is as follows: Upon the death of Theodore Sr., Alma is to receive the income of the Trust for the duration of her life. Immediately after Theodore Sr.'s death, 594 the trustees have two simultaneous powers over the corpus of the Trust. They have the power to invade the corpus for Alma's benefit in certain delineated circumstances. They also have the power to invade the corpus to pay certain of the Estate's expenses and debts. When all of these expenses penses and debts are paid, the "property" or corpus is to be held solely for Alma's benefit. That is, when all of the Estate's expenses and debts are paid, the trustees' power over corpus is limited to providing for Alma. Based upon this construction, we do not think the amounts paid to or on behalf of Alma in excess of the Trust's "income" were paid contrary to the Trust Agreement. The trustees paid such amounts in accordance with their power to invade the corpus for Alma's benefit. [8] We accordingly do not agree with petitioners' argument that the amounts paid to or on behalf of Alma in excess of the Trust's "income" were paid in violation of the *225 terms of the Trust Agreement and were therefore not "properly paid." Furthermore, we see nothing in the record or briefs - other than the argument which we reject - to indicate that such amounts were not "properly paid." We therefore hold that the amounts which the Trust distributed to or paid on behalf of Alma in excess of its "income" were "properly paid" within the meaning of that phrase as it is used in sections 661(a) (2) and 662(a) (2). Our resolution of the three questions discussed should enable the parties to resolve the final two issues by computing, under Rule 50, the Trust's taxable income and Alma's tax consequences as a beneficiary of the Trust during the years in dispute. [9]
*226 Decisions will be entered under Rule 50. Footnotes
1. Thomas Patton was a son-in-law of Theodore Sr.↩
2. It is not clear from the record why the total amount of the payments exceeds the purchase price.↩
3. All statutory references are to the Internal Revenue Code of 1954, unless otherwise indicated.↩
3a. By the time of the trial herein, the Trust had repaid only $4,000 of the "notes." It made these repayments in 1960. It is not clear from the record why the trust paid $4,000 to the Corporations in 1960 and in the same year received $95,000 from them.↩
4. This Court has frequently held that when the respondent concedes part of a matter raised by the pleadings the concession does not affect the burden of proof on matters remaining for decision after the concession. Charles Oran Mensik, 37 T.C. 703 at 724-725 (1962), affd. 328 F. 2d 147 (C.A. 7, 1964). The Mensik situation is to be distinguished from a situation like that in Warner G. Baird, 42 B.T.A. 970↩ (1940), where the respondent attempted to raise new matters.
5. For example, there is nothing in the record - or even the briefs - to suggest that the Estate ever filed Federal fiduciary income tax returns.↩
5a. This discussion is, of course, oversimplified in that it does not take account of statutory details such as the distributable net income limitations in secs. 652(a) and 662(a).↩
6. SEC. 643. DEFINITIONS APPLICABLE TO SUBPARTS, A, B, C, AND D. (b) Income. - For purposes of this subpart and subparts B.C. and D, the term "income," when not preceded by the words, 'taxable," "distributable net," "undistributed net," or "gross," means the amount of income of the estate or trust for the taxable year determined under the terms of the governing instrument and applicable local law. * * *↩
6a. This holding does not affect our previous holding that the Corporations' payments are dividends. The combination of the two holdings is that while the payments are dividends for Federal tax purposes, they are not "income" for local law purposes.↩
7. SEC. 661. DEDUCTION FOR ESTATES AND TRUSTS ACCUMULATING INCOME OR DISTRIBUTING CORPUS. (a) Deduction. - In any taxable year there shall be allowed as a deduction in computing the taxable income of an estate or trust * * * the sum of - (1) any amount of income for such taxable year required to be distributed currently * * * and (2) any other amounts properly paid or credited or required to be distributed for such taxable year; * * * SEC. 662. INCLUSION OF AMOUNTS IN GROSS INCOME OF BENEFICIARIES OF ESTATES AND TRUSTS ACCUMULATING INCOME OR DISTRIBUTING CORPUS. (a) Inclusion. - Subject to subsection (b), there shall be included in the gross income of a beneficiary to whom an amount specified in section 661(a) is paid, credited, or required to be distributed (by an estate or trust described in section 661), the sum of the following amounts: (1) Amounts Required To Be Distributed Currently. * * * (2) Other Amounts Distributed. - All other amounts properly paid, credited, or required to be distributed to such beneficiary for the taxable year. * * * It is clear from the record that secs. 661 and 662 apply during each of the years in issue. See sec. 651(a), last sentence.↩
8. It should be noted that this discussion is not concerned with distributions of "income" to or on behalf of Alma. It is only concerned with distributions of corpus to her or on her behalf. In other words, it is only concerned with the "other amounts" referred to in secs. 661(a) (2) and 662(a) (2).↩
9. In making these computations, the parties vill have to take the following two steps, among others. First, they will have to compute the Trust's distributable net income for each of the years in issue. They will make the computations pursuant to sec. 643(a). During each of the years in issue, substantially all of the Trust's distributable net income consists of the receipts from the Corporations which we have characterized as dividends for Federal tax purposes. As a second step, the parties will have to compute the amounts which the Trusts distributed to or paid on behalf of Alma, including the small amounts of "income" to which she was entitled. It appears from the record that the following categories of disbursements by the Trust should be treated as distributed to or paid on behalf of Alma: A. G. Livernois Household maid FOAB tax Club dues Auto license The amounts distributed to or paid on behalf of Alma will be taxable to her under sec. 662 to the extent of the Trust's distributable net income during each of the years in issue. Such amounts will also, except for a minor adjustment to be made pursuant to sec. 661(c) to take account of the yearly dividend exclusion allowed under sec. 116, be deductible by the Trust under sec. 661 to the extent of its distributable net income during each of the years in issue.↩